IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| ROYCE L. KEITHLEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 2:04-CV-0176-SSC |
| JOANNE B. BARNHART, | : | |
| Commissioner of Social | : | |
| Security, | : | |
| | : | |
| Defendant | : | |

## ORDER

Royce L. Keithley ("Plaintiff") brings this action pursuant to 42 U.S.C.A. §405(g)(West 2003 and Supp. 2005) and 42 U.S.C.A. §1383(c)(3)(West 2003 and Supp. 2005) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). For the reasons that follow, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## Procedural History

Plaintiff applied for DIB on November 14, 2001.(Tr. 21). Following a hearing on November 19, 2002 (Tr. 39-67), the Administrative Law Judge ("ALJ")

1

denied Plaintiff's application on April 24, 2003. (Tr. 18-29).   Plaintiff then submitted additional Veterans Affairs records to the Appeals Council as well as a September 13, 2003 psychological evaluation performed by Dr. Gary Bible. (Tr. 10, 322-427). The Appeals Council denied review on August 13, 2004. (Tr. 7-9). The ALJ's decision is thus the final decision of the Commissioner, and this case is ripe for review under 42 U.S.C.A. §405(g)(West 2003 and Supp. 2005).

## Analytical Framework

An individual is considered to be disabled for the purpose of disability payments if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(A) (West 2003 and Supp. 2005).   The impairment or impairments must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C.A. §423(d)(3)(West 2003 and Supp. 2005).  Moreover, the impairment must be of such severity that it precludes the claimant from performing his previous work and considering his age, education, and work experience, any other kind of substantial gainful work which exists in the national economy. 42 U.S.C.A.

§423(d)(2)(A)(West 2003 and Supp. 2005).  A severe impairment is an impairment which significantly limits a claimant's physical or mental abilities to do basic work activities.  See 20 C.F.R. §404.1520(c)(2005); see also Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984) ("[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.").

The claimant has the initial burden of establishing the existence of a "disability" by demonstrating that he is unable to perform his former employment. Freeman v. Schweiker, 681 F.2d 727, 729 (11th Cir. 1982).  "Once this showing is made, the burden shifts to the Commissioner to prove the existence in the national economy of other types of substantial gainful employment that the claimant can perform."  Hernandez v. Barnhart, 203 F.Supp.2d 1341, 1352 (S.D. Fla. 2002) (citing Allen v. Bowen, 816 F.2d 600, 601 (11th Cir. 1987)); accord Freeman, 681 F.2d at 729.

Under the regulations promulgated by the Commissioner, a five-step sequential procedure must be followed when evaluating a disability claim.  20 C.F.R. § 404.1520(a)(2005).  In the sequential evaluation, the Commissioner must consider in order: (1) whether the claimant is doing substantial gainful activity,

20 C.F.R. §404.1520(a)(4)(i)(2005); (2) whether the claimant has a severe impairment or combination of impairments that meets the duration requirement, 20 C.F.R. §404.1520(a)(4)(ii)(2005); (3) whether the claimant's impairment or combination of impairments meets or equals the Listing of Impairments ("the Listings") found in Appendix 1 to Subpart P of Part 404, Title 20 of the Code of Federal Regulations, 20 C.F.R. §404.1520(a)(4)(iii)(2005); (4) whether the claimant can perform his past relevant work in light of his residual functional capacity, 20 C.F.R. §404.1520(a)(4)(iv)(2005); and (5) whether the claimant is disabled in light of his age, education, work experience, and residual functional capacity, 20 C.F.R. §404.1520(a)(4)(v)(2005).  If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  20 C.F.R. § 404.1520(a)(4)(2005).

## **Factual Background**

### A.    **Vocational Factors**

Plaintiff alleges that he became disabled as of September 11, 2001. (Tr. 94). He was born on December 7, 1948 (Tr. 94), and he was 52 years old at the time of the alleged onset of disability and 53 years old at the time of the hearing.   He has some post-high school education (Tr. 22, 113) and previously worked as a

custodian/janitor at a naval hospital, work that is classified as medium[1] and unskilled[2]; as a boat coxswain in the Navy, work that is classified as medium and skilled[3]; as a dispatcher in the Navy, work that is classified as sedentary[4] and

---

[1]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c)(2005).

[2]"Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.   The job may or may not require considerable strength.   For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.   A person does not gain work skills by doing unskilled jobs."   20 C.F.R. § 404.1568(a)(2005).

[3]"Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced.   Skilled work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work.   Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity."   20 C.F.R. § 404.1568(c)(2005).

[4]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.   Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.   Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a)(2005).

skilled; as a school bus driver, work that is classified as light[5] and semiskilled[6]; and as a parts counter salesperson, work that is classified as light and unskilled. (Tr. 63-64).

**B.**   **Alleged Impairments**

Plaintiff alleges disability due to back problems, left knee injury, limited use of right index finger, problems with right knee and shoulder and emotional and mental problems. (Tr. 107).

**C.**   **Medical History**

The relevant medical records are summarized as follows:

**1.**   **Treating Sources**

**a.**   **Medical University of South Carolina**

Plaintiff was admitted to the Institute of Psychiatry on November 6, 2000

---

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b)(2005).

[6]"Semi-skilled work is work which needs some skills but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."  20 C.F.R. § 404.1568(b)(2005).

for treatment of depression. (Tr. 152).  Although he denied suicidal ideation, his caseworker at the Veterans Affairs (VA) Hospital interpreted a statement he made earlier in the day as such. (Id.).  Throughout his two-day stay, he denied suicidal or homicidal ideation and all psychotic symptoms. (Id.).  He had no prior psychiatric hospitalizations. (Id.).  He had a history of past alcohol abuse and a history of frequent severe headaches and arthritic pain in his lumbosacral spine and right knee, although his physical examination was "unremarkable." (Id.).  His urine drug screen was positive for cannabinoids and benzodiazepines. (Id.).  While he was hospitalized, he secured a job, and he planned to go home to live with his wife. (Tr. 153).  His condition on discharge was stable, and his discharge diagnoses were: Axis I[7]: Major depressive disorder and Cannabis abuse; Axis III: Hyperlipidemia. (Id.).  His Global Assessment of Functioning (GAF) was 65.[8]  (Id.).  His discharge medications were Wellbutrin, Zoloft, Valium and a multivitamin.

---

[7]The five axes included in the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (the "DSM IV") multiaxial classification are: Axis I Clinical Disorders, Other Conditions That May Be a Focus of Clinical Attention; Axis II Personality Disorders, Mental Retardation; Axis III General Medical Conditions; Axis IV Psychosocial and Environmental Problems; and Axis V Global Assessment of Functioning.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed. 2000).

[8]According to the DSM IV, a GAF of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." (Id. at 34).

(Id.).   He was advised to continue activity as tolerated, follow a low-fat and cholesterol diet, attend appointments with his mental health professionals, take his medications and avoid illicit drugs and alcohol. (Id.).

### b.   Mountain Comprehensive Care Center

Plaintiff was initially seen at the Center on September 28, 2001. (Tr. 186). He reported sleeping problems, fatigue and daily crying spells. (Id.).   He also reported problems with memory and concentration and an increase in irritability and anger outbursts. (Id.).  He reported anhedonia and social isolation. (Id.).  He also reported anxiety and increased heart rate and nervousness. (Tr. 190).   In addition, he reported that his symptoms had increased in frequency in the past two months. (Id.).  He denied suicidal or homicidal ideation, but he did express that he would be "better off dead." (Tr. 186).   He had recently separated from his wife of 24 years and was getting a divorce, and he had quit his last job two weeks earlier and was homeless. (Id.).  He indicated that he wanted more treatment than the VA could offer. (Id.).  He denied currently using any drugs or alcohol. (Id.).  He reported "constant back pain" and high cholesterol, for which he was receiving treatment at the VA Hospital in Huntington, as well as headaches. (Tr. 186, 190).  He was diagnosed with "major depression single episode – moderate."

(Tr. 189). His current GAF was 40,[9] and his highest GAF in the past year was reported as 60.[10] (Id.).

The Center's records indicate that on October 10, 2001, Plaintiff's mood remained depressed, and he reported continued difficulty sleeping and lack of activity. (Tr. 184). He also reported having constant pain in his back. (Id.). He was seeking employment, but he was unable to find work. (Id.).

On October 25, 2001, Plaintiff reported having panic attacks, during which his heart raced, he got light-headed and he had difficulty breathing. (Tr. 181, 184). It was also noted that he was still trying to find work, but was unsuccessful. (Id.).

On November 7, 2001, it was noted that Plaintiff saw the doctor, but left before being seen by the therapist, and that this was the second time he had done that. (Tr. 181). It was noted that "[h]e apparently has a very low frustration

---

[9]According to the DSM IV, a GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." (Id. at 34).

[10]According to the DSM IV, a GAF of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." (Id. at 34).

level." (Id.).   The doctor's notes indicate that Plaintiff reported long-term depression, fatigue, excitability, paranoia, decreased memory and concentration, lightheadedness and irritability. (Tr. 178).  He was taking Celexa, Trazodone and Valium, but reported that he took the Celexa and Trazodone "only when he wants to." (Id.).  Upon examining Plaintiff, the doctor found that his gait was normal; he appeared to be depressed, and his affect was restricted; he was "somewhat reluctant to start any new medicines"; he denied suicidal or homicidal ideation or hallucinations; and his judgment and insight were fair. (Tr. 179).  He was diagnosed with "Major Depression, severe with psychosis [rule out] Generalized Anxiety Disorder." (Id.).  His GAF was 60. (Tr. 180).

On December 6, 2001, Plaintiff cancelled his appointment because he was going out of town. (Id.).

### c.    VA Records

In a January 17, 2001 visit to the VA facility, Plaintiff complained of right knee pain, he reported having depression, high cholesterol, back pain and a bone spur on his right shoulder. (Tr. 216).  He denied any barriers to learning (Tr. 214).

On April 5, 2001, Plaintiff was seen for complaints of chest discomfort, right knee and chronic low back pain.  (Tr. 222).  At that time, he was continued on

10

Zoloft and Trazodone for depression and Percocet and ibuprofen for his right knee meniscal tear.  (Tr. 213).

On April 18, 2001, Plaintiff reported that he was having knee surgery the following month. (Tr. 207).  He described his pain as a "7" on a scale of 0 to 10. (Id.).  He reported that he was currently unemployed due to his physical problems and was homeless. (Tr. 208).  He said he had poor memory and concentration, sleep problems, problems with his temper, lethargy and crying spells. (Tr. 208, 213).  He reported that he has suffered from depression since 1995. (Tr. 211).  His diagnoses included, *inter alia*, depression, spinal disc condition, and traumatic arthritis. (Tr. 210).  His GAF was assessed at 50. (Id.).[11] It was noted that he wanted to be seen for medication, but declined counseling. (Id.).

On July 6, 2001, Plaintiff reported that he continued to feel depressed, he had poor memory and sleep problems, but he was not taking his Trazodone. (Tr. 212).  He was not crying as much, his irritability had decreased, and he reported no side effects. (Id.).

---

[11]According to the DSM IV, a GAF score of 41 to 50  indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (Id. at 34).

On August 10, 2001, Plaintiff reported back and knee pain and requested a "light duty note." (Tr. 203).  He claimed he had an abnormal MRI performed in his hometown, but there was no record of it. (Id.).  His knee appeared to be stable without swelling, and his gait was normal. (Id.).

On September 4, 2001, Plaintiff was seen for follow-up after a previous appointment revealed the presence of blood in his urine, for which he had been given antibiotics. (Tr. 199).  He complained of chronic low back pain, but was "otherwise doing okay." (Tr. 200).  He had some muscle spasm, but no muscle weakness, and he could walk on his heels and on his tiptoes. (Tr. 201).  He had good pulses, no edema, no knee effusion, and no radiculopathy. (Id.).  He was started on Tylenol as needed. (Id.).  His depression was stable on medications. (Id.).

On November 28, 2001, Plaintiff's pain was noted as a "O." (Tr. 193).  His low back pain was stable, although he reported some joint pain. (Id.).  He was offered a referral to rheumatology, but he wanted to wait. (Id.).  It was noted that his dyspepsia, anxiety and depression were stable on medications. (Id.).

In a March 28, 2002 visit, to follow up his low back pain and other conditions, Plaintiff complained of a cough, but his examination was otherwise essentially normal. (Tr. 320).  His pain was a "0." (Id.)

12

### d.    Dr. Roger W. May

A March 5, 2001 MRI of Plaintiff's lumbar spine showed mild spinal stenosis at the L4-L5 level, but no evidence of focal protruding or herniated discs at any level. (Tr. 277).  An MRI of his right knee showed "a complex tear involving the posterior horn and body of the medial meniscus," and a "popliteal cyst and small joint effusion." (Id.).

On March 30, 2001, Plaintiff reported severe right knee pain, especially at night, and sleeping problems. (Tr. 269).  He was referred to an orthopedic surgeon. (Id.).

A July 11, 2001 note indicates that Plaintiff had not had knee surgery because it was not approved by the insurance company. (Tr. 267).  At that time, Plaintiff had decreased range of motion, strength and motor tone in his right shoulder. (Tr. 267).  An MRI of his shoulder showed mild degenerative changes, but no evidence of rotator cuff tear. (Tr. 266).

On November 19, 2001, Plaintiff reported joint pain and he had swelling. (Tr. 263).

On March 19, 2002, Plaintiff reported some abdominal pain, and it was noted that it was possible but doubtful that he had a hernia.  (Tr. 262).  Chest and abdominal X rays were normal. (Tr. 261).

13

2.    **State Agency Consultants**

    a.    **Mental**

In a February 15, 2002 Psychiatric Review Technique Form (PRTF), a state agency psychiatrist, Dr. Edward Ross, found that Plaintiff suffers from major depressive disorder and substance addiction disorder. (Tr. 238, 243).  Dr. Ross found that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (Tr. 245). In a February 15, 2002 Mental Residual Functional Capacity Assessment (MRFCA), Dr. Ross also found that Plaintiff was moderately limited in his abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and in his ability to interact appropriately with the general public. (Tr. 249-50).

In an April 18, 2002 PRTF, state agency psychologist Dr. Stodola found that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace, although those difficulties are moderate with respect to complex tasks; and no episodes of decompensation. (Tr. 296).  In a MRFCA, Dr. Stodola found that Plaintiff's ability to maintain attention and concentration for

extended periods was moderately to not significantly limited, and his ability to interact appropriately with the general public was moderately limited. (Tr. 300-01).

        **b.**   **Physical**

In a February 22, 2002 Physical Residual Functional Capacity Assessment (PRFCA), a state agency physician opined that Plaintiff is capable of occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; standing and/or walking about 6 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; and pushing and/or pulling with his upper extremities. (Tr. 254).  The physician opined that Plaintiff was limited in his ability to push and/or pull with his lower extremities to no more than 10 hours. (Id.).  The physician also opined that Plaintiff was could only occasionally climb ladders, ropes or scaffolds; balance; stoop; kneel; crouch; or crawl. (Tr. 255).  The physician also opined that Plaintiff should avoid concentrated exposure to extreme cold and vibration. (Tr. 257).

In an April 15, 2002 PRFCA, a state agency physician assessed Plaintiff to have limitations similar to those found in the February 2002 PRFCA. (Tr. 278-85).

    **3.**   **Evidence Presented to Appeals Council**

        **a.**   **VA Medical Center**

These documents include records from the Charleston VAMC as well as the Huntington facility.  On October 1, 1996, a Neuropsychological Evaluation was performed. (Tr. 417-22).  Mental health counseling records from December 11, 1997 until March 5, 1999 show that Plaintiff reported problems with his marriage and his work. (Tr. 389-415).  He was first seen in Primary Care on September 8, 2000, at which time it was noted that he had been seen since 1996 for depression. (Tr. 385).  He reported some dizziness and loss of balance when he stood up quickly, severe monthly headaches, chest pain, and sleeping problems. (Id.).  He did not feel the need to talk about stress or feeling sad or "blue" that day. (Tr. 383).  He reported no difficulty reading or understanding instructions and no barriers to learning. (Tr. 384).

On June 19, 2002, Plaintiff was seen in Psychiatry Services for a medication review. (Tr. 365).  He had not been there in almost a year because he did not like the doctor he had been seeing and felt that the doctor was "pushing medication." (Id.).  Plaintiff reported that he had been having problems with depression, concentration, sex drive, anergia and memory since 1996. (Id.).  He was taking Trazodone only sporadically, and Celexa, and he was willing to try new medication. (Id.).  His medication was changed to Venlafaxine and benadryl. (Id.).  His GAF was 50. (Tr. 366).

16

On July 12, 2002, Plaintiff complained that he was having sleeping problems and that his new medication was not helping him, so the dosage was increased. (Tr. 364).

On August 29, 2002, Plaintiff had an eye examination after he complained of headaches due to his glasses. (Tr. 361).  He also had an appointment with an audiologist and his hearing was found to be essentially normal. (Tr. 360).

On September 13, 2002, Plaintiff reported that he could not control his anger. (Tr. 359-60).  He had stopped taking his medications because he felt they were not working, but he felt worse after he stopped taking them. (Tr. 360).

During a September 24, 2002 visit to follow up on his high lipids, Plaintiff again denied barriers to learning. (Tr. 359).  His pain on that day was rated at "2," and his examination was essentially normal. (Tr. 355).

On October 1, 2002, Plaintiff was seen for a mental health medication review. (Tr. 354).  He reported that the Remeron made him sleep all the time, increased his anger and made him dizzy, and he wanted to change his medication back to Celexa. (Id.).

On November 1, 2002, Plaintiff reported that he was not feeling better on Celexa and was still feeling dizzy, so his medication was changed to Zoloft. (Tr. 352-53).

In a November 12, 2002 visit, Plaintiff was alert, cooperative and in no acute distress. (Tr. 349).  He complained of right knee pain and problems with flexion on occasion, but not of stiffness or weakness. (Tr. 349-50).  He reported that he had swelling after standing and a "hot feeling," but no redness, right knee instability, giving way or locking. (Tr. 350).  He reported using Tylenol #4 for his knee and back pain. (Id.).  He stated that activity precipitates "flares," and the pain goes to a "7" on a scale of 0 to 10 and lasts from 30 minutes to a day or two. (Id.).  He said that he had to quit his job as a bus driver in September 2001 because of the knee pain. (Id.).  He also said that he had a torn meniscus, but had been avoiding surgery. (Id.).

The physician found some limitation of the range of motion of Plaintiff's knees, but his gait was normal, and he did not seem to have any limitations standing or walking. (Id.).  He got on and off the exam table without problems. (Tr. 350-51).  There was no evidence of inflammatory arthritis. (Tr. 351).

With respect to his back pain, Plaintiff said that it was an "8" all the time, and he took Tylenol #4 and Ibuprofen 800 for it. (Id.).  Sitting, standing, walking or lifting increased the pain. (Id.).  Lying down or sitting in a chair with lumbar support helped. (Id.).  He said he could walk about 20 minutes on good days. (Id.).  He made no complaints of falls or unsteadiness, and he reported no specific

injuries to his back other than surgery in 1995. (Id.).  His range of motion was somewhat limited, and he had increased lordosis; however, his posture and gait were normal, he had no scoliosis, he had a symmetrical appearance, and the position of his head was normal. (Tr. 351-52).  He had smooth rhythm with repeated forward bending, although he did have decreased range of motion.  (Id.). The physician noted no objective findings of painful motion, spasms, weakness or tenderness; there was no fixed deformity; and the musculature of the back appeared normal. (Tr. 352).  Neurological examination was essentially normal. (Id.).  An X ray of Plaintiff's spine showed degenerative disc disease, and X rays of the knees and hand were normal. (Tr. 323-24, 352).

In a December 5, 2002 visit, Plaintiff was advised to exercise at least 30 minutes, 3 times a week, to decrease his risk of heart disease. (Tr. 348-49).  He reported his pain at a "10," and said his left knee pain was getting worse, although there was no injury. (Tr. 344-45).  An X ray was "okay." (Tr. 345).

A December 9, 2002 CT scan of Plaintiff's lumbar spine showed degenerative changes at L5-S1 with broad-based disc bulge, mildly impinging on the thecal sac, but no central canal stenosis. (Tr. 322).

On April 11, 2003, Plaintiff was seen for a "ru[ ]nny stuffy nose" and reported his pain at a "3." (Tr. 337).  Except for an upper respiratory condition,

his examination was essentially normal. (Id.).  Plaintiff denied that he had any barriers to learning. (Tr. 340).

### b.   Gary H. Bible, Ph.D.

Dr. Bible performed a consultative psychological examination of Plaintiff on September 19, 2003. (Tr. 423-26).  Dr. Bible noted that Plaintiff had received mental health counseling at the VA Hospital from 1996 until two years before Bible's evaluation, but that he had not received any counseling since then.  (Tr. 424).   Plaintiff reported that his depression, which he had experienced since 1996, had "particularly worsened over the past six months 'like I'm going backwards.' " (Id.).  Plaintiff reported sleep disturbance, fatigue, lack of interest and motivation, irritability, impaired attention and concentration and occasional passive suicidal ideation. (Id.).  He said he believed that his medications helped him because when he attempted to discontinue them, his condition worsened. (Id.).  He also reported symptoms of a generalized anxiety disorder. (Id.).  Plaintiff stated that he could not work because of his back and knee pain, his memory and anger problems. (Id.).

Plaintiff's reported activities of daily living included watching television for an hour and a half, napping for an hour and sitting on his front porch for four to five hours a day "thinking about my past life, my mistakes, and trying to relax."

(Id.).  He reported that he does not read because of impaired attention and concentration; he helps with the laundry and cooking, but does no heavy lifting or physically demanding chores. (Id.).  He takes one or two trips out of the house a week to go for a ride or to a convenience store, but he avoids social situations and crowds. (Tr. 425).  He reported having no hobbies or interests except sitting on the porch petting the cat. (Id.).  He does not handle his finances because he is afraid of making errors. (Id.).

Plaintiff "exhibited a number of pain related behaviors" during Bible's examination. (Id.).  Bible's interview and testing "provide[d] indications of co-existing depressive and anxiety disorders appearing poorly stabilized." (Tr. 426).  Plaintiff's diagnoses included major depressive disorder, recurrent and severe; probable generalized anxiety disorder; and "[r]ule out [p]ain [d]isorder." (Id.).  Bible assessed Plaintiff's GAF at 50-60. (Id.).  Bible wrote that Plaintiff "created the impression of a significantly distressed individual who would be expected to experience numerous work[-]related difficulties without more effective mental health interventions." (Id.).  Bible opined:

> Although he appears capable of understanding and carrying out instructions, his ability to sustain focused attention/task persistence, adhere to a work schedule and meet production norms appears seriously limited to precluded in meeting the demands of a 40 hour per week competitive work environment.  His ability to deal

> with work related stressors appears clearly precluded at present.
> With respect to his ability to manage social interactions, his abilities
> appear limited to seriously limited.

(Id.).

**D.   Hearing Testimony**

**1.   Plaintiff**

Plaintiff is unmarried and has no children living with him. (Tr. 44).  He has both a regular driver's license and a commercial driver's license, but the medication he takes prevents him from driving heavy equipment. (Id.).  He has completed some college (Tr. 45; see also Tr. 113); however, he rates his reading, spelling, punctuation and grammar abilities as poor. (Tr. 45).  He rates his ability to perform basic math as fair. (Id.).  He has help paying his bills. (Id.).

He was in the Navy for approximately 19 years. (Tr. 46).  He was a boat coxswain and he ran a dispatch office for a motor pool out of the Naval Hospital in Camp Lejeune, North Carolina. (Id.).  He kept track of maintenance, dispatched vehicles and personnel to different clinics and was in charge of "medivacs." (Id.).  After he left the service, he worked as a janitor in the Naval Hospital in Charleston, South Carolina. (Tr. 47).  He was required to lift 5-gallon containers, handle machinery and do a lot of standing. (Id.).  He also worked part-time as a parts salesman while he worked as a janitor and he then worked

as a school bus driver. (Tr. 47-48).

Plaintiff became disabled as of September 11, 2001 because "that's when it got to where the pain was really bothering [him]." (Tr. 47).  He has not worked since that date. (Id.).  He said he cannot work because of knee problems, back problems and mental problems. (Tr. 48).  He had surgery on his left knee in about 1987, but he still has problems with swelling, pain and stiffness. (Tr. 48, 54).  He has been told he needs surgery on his right knee, but that has not been scheduled, and he wears a knee brace on that knee. (Tr. 49, 53).  When his left knee swells, he tries to get off it and rest. (Tr. 49).  He also uses a heating pad, which seems to help. (Id.).  He had physical therapy after the left knee surgery, but it did not help. (Id.).  He has a bone spur in his right shoulder. (Tr. 53).  He also may have a hernia, and he has stomach pain. (Tr. 53, 58).  He has pain in his lower back, which radiates down his right leg. (Tr. 53).  He said the pain is caused by an injury to his back, for which he had surgery in 1995, and wear and tear. (Tr. 54).  He does not wear a brace or support for his back. (Id.).  He had two sessions of physical therapy following his back surgery, but it did not help. (Id.). He has not used a TENS unit. (Id.).  When asked how often he sees a doctor about his back and knee pain, Plaintiff responded that he "live[s] with it now" and "just go[es] and get[s] medication." (Tr. 55).  He is treated at the VA Hospital in

Huntington. (Id.).  He has difficulty lifting, and sitting or standing for any length of time aggravates his pain. (Tr. 62).

When asked what kind of mental problems he is having, Plaintiff responded that he gets the "shakes," his heart races, and he gets excited and upset to the point he "just really can't do nothing." (Tr. 55-56).  This happens once or twice a week and lasts a couple of hours.  (Tr. 56).  He said his medication "works" to calm him down. (Id.).  He tried to get off his medication, but that "was a disaster." (Id.).  He was seeing a counselor once a week in Charleston, but he has not seen one since he moved from there though he is trying to arrange for counseling. (Tr. 57).  He has memory and concentration problems. (Tr. 60-61).  He has also been diagnosed with depression and was hospitalized for depression. (Tr. 61).  He gets sad, has crying spells and does not want to do anything. (Id.).  He also lacks energy and focus, and it takes him "all day long" to complete simple tasks. (Id.).  He takes an allergy medicine to help him sleep, "which . . . seems to be doing a whole lot better." (Tr. 62)

He takes cholesterol medication and he takes ibuprofen for headaches. (Tr. 50).  He also apparently takes medication for his mental problems, but he could not recall the name. (Id.).  He says his medications cause him to pass out or

experience lightheadedness, usually in the afternoon or evening. (Tr. 51).  His pain medication helps with the pain, but when he gets a headache, the only thing he can do is lie down. (Tr. 52-53).  He was getting headaches three or four times a week, but now he gets them once a week. (Tr. 52).  He believes they are caused by stress. (Tr. 53).

Plaintiff has no problems showering, shaving and dressing himself. (Tr. 59). He spends his days inside the house, although he will go out and walk a little bit. (Id.).  He does not like being around "a bunch of people." (Tr. 60).

### 2.   **Vocational Expert**

The Vocational Expert (VE) testified that Plaintiff previously worked as a custodian/janitor at a Naval Hospital, work that is classified as medium and unskilled; as a boat coxswain in the Navy, which is medium and skilled work; as a dispatcher in the Navy, which is classified as sedentary and skilled work; as a school bus driver, which is light and semiskilled work; and as a parts counter salesperson, work that is classified as light and unskilled. (Tr. 63-64).  The ALJ posed the following hypothetical to the VE with respect to a claimant assumed to be Plaintiff's age and to have his education and work experience:

> Let's start off assuming that the individual's limited to light exertional work; only occasionally climb ladder or scaffold;

occasionally stoop, kneel, crouch, or crawl; we need to avoid
concentrated exposure to cold and vibration; only occasional
operation of foot controls with the right lower extremity; and the
individual's moderately limited in the ability to maintain attention
and concentration for extended periods of time, the ability to
perform activities within a schedule, maintain regular attendance
and be punctual within customary tolerances, and the ability to
interact appropriately with the general public, but retains the ability
to recall simple tasks.  With those limitations, could you identify any
work in the region or national economy?

(Tr. 64).   The VE testified that such a person would be able to work as a light

manufacturing machine operator, which would include operating punches and

presses, and dye cutting and injection molding equipment. (Id.).  Such a person

could also work as a kitchen preparation worker, which is unskilled work. (Tr.

65).  In addition, at the sedentary level, such a person could work as a small parts

assembler, small machine tender or machine monitor. (Id.).

The ALJ asked the VE if there would be work Plaintiff could perform if he

were deemed fully credible, and the VE replied that there would not be because

of Plaintiff's alleged episodic swelling and severe knee pain, which "severely limits

his basic mobility, ability to walk and to remain on his feet." (Id.).  In addition, the

VE noted that Plaintiff had alleged severe headache pain and syncope episodes,

all of which "would make it unlikely that he could maintain adequate attendance

or attend a task on a consistent basis primarily because of the pain from the

various locations, back, shoulder, knees." (Tr. 65-66).

## The ALJ's Decision (Tr. 18-29)

The ALJ found that Plaintiff "has right knee pain due to status-post tear of the medial meniscus and depression, impairments that are severe . . . but that do not meet or medically equal" the Listings. (Tr. 23; 24-25).  The ALJ found that Plaintiff's other alleged impairments, i.e., back pain and hiatal hernia, "pose few significant work[-]related limitations and are non-severe impairments." (Tr. 23). With respect to Plaintiff's knee, the ALJ found there was no evidence that Plaintiff had difficulty with weight bearing, and there were no significant findings other than evidence of the meniscus tear, and his knee impairment therefore did not meet or equal the Listings. (Tr. 23-24).  The ALJ also considered Plaintiff's mental impairments in light of Listing 12.04, and he found that Plaintiff met the "A" criteria for depression. (Tr. 24).  The ALJ then evaluated the severity of Plaintiff's functional limitation pursuant to the "B" criteria. (Id.).  The ALJ found no degree of limitation in Plaintiff's activities of daily living; moderate degree of limitation in his social functioning; moderate degree of limitation in his concentration, persistence and pace; and no evidence of episodes of deterioration

or decompensation in work or work-like settings. (Tr. 24-25).  The ALJ went on to find that Plaintiff did not meet the "C" criteria of the Listing. (Tr. 25).

Because the ALJ found that Plaintiff does not meet or equal any Listing, he then considered Plaintiff's residual functional capacity ("RFC"). (Id.).  The ALJ found that the medical records support some, but not all of Plaintiff's subjective complaints and do not reflect findings consistent with total disability. (Tr. 26). The ALJ noted that Plaintiff's examinations show essentially normal findings, with only mild degenerative changes, and that no treating physicians have opined that Plaintiff is unable to work. (Id.).  The ALJ also considered the state agency consultants' opinions that Plaintiff can perform light work and that he has only moderate restrictions based on his emotional problems. (Id.).  The ALJ opined that Plaintiff has the following RFC:

> Claimant is able to perform work at the light exertional level. Claimant experiences limitations in performing a full range of light activities in that he can only occasionally climb ladders, ropes and scaffolds; stoop, kneel, crouch and crawl.   He should avoid concentrated exposure to cold and vibrations; may occasionally operate . . . foot controls with the right lower extremity . . . . Claimant is also moderately limited in the ability to: maintain[] attention and concentration for extended periods; perform[] activities within a schedule; maintain[] regular attendance, be[] punctual; and [interact] appropriately with the general public; but is able to recall simple tasks.

(Id.).  Based on the VE's testimony, the ALJ found that Plaintiff is unable to return to his past work, but that there is other work he can perform, including unskilled light jobs such as machine operator and unskilled sedentary jobs such as parts assembler and machine tender. (Tr. 26-27).  The ALJ concluded, therefore, that Plaintiff is not disabled. (Tr. 28).

The ALJ's specific findings were:

1)   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2)   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3)   The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(b).

4)   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5)   The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6)   The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 C.F.R. §404.1527).

7)   The claimant has the following residual functional capacity: claimant is able to perform work at the light exertional level.  He can only occasionally climb ladders, ropes and scaffolds; stoop, kneel, crouch and crawl.  He

should avoid concentrated exposure to cold and vibrations; may occasionally operate . . . foot controls with the right lower extremity. Claimant is also moderately limited in the ability to: maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance, being punctual; and in interaction appropriately with the general public; but is able to recall simple tasks.

8) The claimant is unable to perform any of his past relevant work (20 C.F.R. § 404.1565).

9) The claimant is an "individual closely approaching advanced age" (20 C.F.R. § 404.1563).

10) The claimant has "more than a high school education" (20 C.F.R. §404.1564).

11) The claimant has no transferable skills (20 C.F.R. § 404.1568).

12) The claimant has the residual functional capacity to perform a significant range of light work (20 C.F.R. § 416.967).

13) Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.14 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.

14) The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 404.1520(f)).

(Tr. 28-29).

## **Standard of Review**

The scope of judicial review of the Commissioner's decision is limited. The

court's function is to determine (1) whether the record, as a whole, contains substantial evidence to support the findings and decisions of the Commissioner and (2) whether the Commissioner applied proper legal standards. <u>See</u> <u>Vaughn v. Heckler</u>, 727 F.2d 1040, 1042 (11th Cir. 1984); <u>see also</u> <u>Wiggins v. Schweiker</u>, 679 F.2d 1387, 1389 (11th Cir. 1982).  Substantial evidence is more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>See</u> <u>Holladay v. Bowen</u>, 848 F.2d 1206, 1208 (11th Cir. 1988); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983).

## **Issues on Appeal**

Plaintiff alleges the ALJ erred by: 1) failing to give proper weight and consideration to Plaintiff's subjective complaints of pain; and 2) failing to complete and attach the Psychiatric Review Technique form to his decision. (Pl. Br., p. 2).  Plaintiff also contends that the case should be remanded to the ALJ for consideration of new evidence submitted to the Appeals Council. (<u>Id.</u>).

## **Discussion**

A.   **Plaintiff's Subjective Complaints of Pain**

Plaintiff argues that his subjective complaints of pain "warrant a finding of his disability" given his statements at the hearing, statements given during medical examinations and a notation on at least one state agency RFC

31

assessment. (Pl. Br., pp. 10-11).  Plaintiff asserts that he has provided medical evidence of a long history of lower back problems, a meniscal tear in his right knee and a laminectomy for a herniated disc, and that these conditions can be expected to cause a severe level of pain. (Pl. Br., p. 11).  Plaintiff argues that the ALJ failed to explicitly discredit Plaintiff's testimony and erred by "giving only conclusory findings referenced to the record as a whole." (Pl. Br., p. 12).

Plaintiff cites the case of Willis v. Callahan, 979 F.Supp. 1299 (D.Or. 1997) for the proposition that "[a] claimant is not required to produce objective medical evidence of the severity of his/her symptoms. . . ." (Id.).  Willis, however, involved a claimant with fibromyalgia, a condition "which often lacks medical or laboratory signs, and is generally diagnosed mostly on a[n] individual's described symptoms." Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). Accordingly, Willis is inapposite. See also Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (court upheld the ALJ's credibility findings because the claimant "failed to set forth the requisite objective medical evidence that confirmed the severity of the alleged pain arising from the alleged [conditions] . . . or that the objectively determined medical conditions are of such a severity that they can be reasonably expected to give rise to the alleged pain.").

The undersigned finds that the ALJ's findings with respect to Plaintiff's credibility are supported by substantial evidence, and that the ALJ properly discredited Plaintiff's testimony as to the severity of his limitations.  The ALJ

noted that Plaintiff's examinations show essentially normal findings, with only mild degenerative changes, and no treating physicians opined that Plaintiff was unable to work. (Tr. 26).   Plaintiff has not pointed to any objective finding contained in the records that were before the ALJ that supports the <u>severity</u> of the limitations Plaintiff alleges.[12]   The ALJ also considered the state agency consultants' opinions that Plaintiff can perform a wide range of light work and had only moderate restrictions based on his emotional problems. (<u>Id.</u>).   State agency consultants "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation," and "administrative law judges must consider findings of State agency medical and psychological consultants . . . as opinion evidence. . . ." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i); <u>see also</u> SSR 96-6p.

  With respect to Plaintiff's assertion that the "notes on at least one Residual

---

[12]Plaintiff points to the bulge at L5-S1 (Pl. Br., pp. 7-8, 14) as a condition which supports Plaintiff's complaints.   However, the evidence regarding that condition is contained only in the records submitted after the ALJ's decision (Tr. 322).   Evidence presented after the ALJ's decision is not relevant to the issue of whether substantial evidence supports the ALJ's findings. <u>See</u> <u>Falge v. Apfel</u>, 150 F.3d 1320, 1323 (11th Cir. 1998)("[W]hen the [Appeals Council] has denied review, we will look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence"), <u>cert. denied</u>, 525 U.S. 1124 (1999).   Furthermore, Plaintiff has not shown that the condition itself evidences the severity of the pain alleged.   "A diagnosis alone is an insufficient basis for a finding that an impairment is severe.   The severity of a medically ascertained impairment must be measured in terms of its effect upon ability to work and not simply in terms of deviation from purely medical standards of bodily perfection or normality." <u>Sellers v. Barnhart</u>, 246 F.Supp.2d 1201, 1211 (M.D. Ala. 2002) (citing <u>McCruter v. Bowen</u>, 791 F.2d 1544, 1547 (11th Cir. 1986)).

Functional Capacity Assessment" demonstrate that Plaintiff's subjective complaints warrant a finding of disability (Pl. Br., p. 11), no state agency physician expressed opinions that would support a determination that Plaintiff was unable to perform work at any exertional level.[13]   Both physicians who evaluated the case were of the opinion that Plaintiff can perform a wide range of activities constituting light work, with some postural and environmental limitations (<u>see</u> Tr. 253-60, 278-85).   These limitations were then incorporated into the ALJ's findings (<u>see</u> Tr. 26).   The undersigned finds that substantial evidence supports the ALJ's treatment of Plaintiff's credibility and determination of Plaintiff's RFC.

**B.**   <u>**Psychiatric Review Technique Form**</u>

Plaintiff argues that the ALJ erred by failing to attach a Psychiatric Review Technique Form (PRTF) to his decision.   He cites 20 C.F.R. § 404.1520a, which he contends requires the ALJ to complete a PRTF when evaluating mental impairments.   (Pl. Br., pp. 18-19).

The court notes that 20 C.F.R. § 404.1520a has been amended, and as amended it does not require the ALJ to attach the PRTF to his decision, as long as the ALJ documents application of the technique in his decision.   20 C.F.R.

---

[13]Furthermore, as the ALJ noted, "[n]o treating physicians opined that claimant was unable to perform work activities at any exertional level."  (Tr. 26).

§404.1520a(e) provides that at the initial and reconsideration levels of the administrative review process, a PRTF will be completed.  That was done in this case (see Tr. 235-48, 286-99).   However, that regulation goes on to state, "At the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision), we will document application of the technique in the decision."   Contrary to Plaintiff's assertion that 20 C.F.R. § 404.1520a(d) "requires also that the procedure be documented at every level and that the PRTF must be attached to the ALJ's decision" (Pl. Br., p. 18), § 404.1520a(d) does not provide that the PRTF must be attached to the ALJ's decision.   The ALJ discussed all of the categories set out in the PRTF in his decision and made findings with respect to each (Tr. 24-25), thereby documenting the application of the technique in his decision, as required by 20 C.F.R. § 404.1520a(e).   Accordingly, there is no merit to Plaintiff's argument that the ALJ erred by failing to attach a PRTF to his decision.[14]

## C.   **New Evidence**

Plaintiff argues that the case should be remanded to the ALJ for consideration of new evidence, specifically, the exhibits submitted to the Appeals

---

[14]Although the Eleventh Circuit recently stated that the ALJ is required to attach a PRTF to his decision, Moore v. Barnhart, 405 F.3d 1208, 1214 (11th Cir. 2005), it appears that the previous version of 20 C.F.R. § 404.1520a(d) was at issue in that case.  See 65 Fed. Reg. 50,746, available at 2000 WL 1173632 at *50758 (Aug. 21, 2000).  Furthermore, the ALJ in that case failed to document the application of the technique in the decision.  Id.  The ALJ in this case, however, analyzed all areas included in the PRTF.

Council, which included additional VA records (AC-1) and Dr. Bible's evaluation (AC-2). (Pl. Br., p. 15).

Sentence six of 42 U.S.C. § 405(g) (Supp. 2005) provides in part that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ." The Eleventh Circuit has held that in order to obtain a remand of the case based on evidence presented to the Appeals Council, Plaintiff must show that:

> (1) there is new noncumulative evidence;  (2) the evidence is 'material,' that is, relevant and probative so that there is a reasonable possibility that it would change the administrative result[;]  and (3) there is good cause for the failure to submit the evidence at the administrative level.

Caulder v. Bowen, 791 F.2d 872, 877 (11th Cir. 1986); see also Falge, 150 F.3d at 1323.


### 1.    VA Records

With respect to the "new" VA records (which span the period from 1996 until 2003), Plaintiff asserts that these records are "noncumulative and new." (Pl. Br., p. 16).  Plaintiff says that his application for benefits referred to those records, (Tr. 110), and that Plaintiff's previous attorney and the Commissioner

should have obtained them. (Pl. Br., p. 16).  Plaintiff now asserts ineffective assistance of counsel by his previous attorney. (Id.).  Plaintiff also contends that the ALJ had a duty to obtain those records "in order to develop a full and fair record." (Id.).  Plaintiff contends that these "new" VA records would show "his long history of depression and the treatment thereof with medications and therapy." (Pl. Br., p. 17).  Plaintiff also contends that these records "give further support to the extent of Plaintiff's physical impairments and pain." (Id.).

Pretermitting the issue of whether good cause exists for Plaintiff's failure to provide the VA records which pre-date the decision date, the undersigned finds that the additional VA records are not noncumulative and material such that there is a reasonable possibility that they would change the administrative result.[15]  Many of the records pre-date the alleged September 2001 onset of disability date, some by as much as five years.  This was well prior to the time Plaintiff asserts he had to quit working because of his conditions.  For example, the 1996 Neuropsychological Evaluation (Tr. 417-22) showed that Plaintiff demonstrated a learning disability in reading and spelling, and that he suffered

---

[15]The undersigned notes that at the end of the hearing, the ALJ asked Plaintiff's attorney if the ALJ had all of the records, and the attorney responded, "I believe so. . . ." (Tr. 66). Furthermore, Plaintiff did not provide the dates of his treatment at the VA Hospital on his application for disability benefits. (Tr. 110). As noted by the Commissioner, the ALJ did not issue a decision until 5 months after the hearing.  Therefore, Plaintiff had 5 months to submit additional records, but he did not do so.

from "a clinically significant level of depression. . . ." (Tr. 420).  However, these conditions or limitations did not prevent him from working from 1996 until September 2001 as a janitor, telephone solicitor, auto parts salesman and bus driver. (Tr. 116).

While these additional records do show that Plaintiff complained of and received treatment for conditions such as depression, anxiety, back and knee problems, the records considered by the ALJ in making his decision already provided that information. In fact, the ALJ discussed all of these conditions in his decision and found that the "medical records support some, but not all of claimant's allegations of limitations due to his symptoms," and that the "evidence reveals moderate restrictions due to his symptoms" and "supports the chronic nature of his complaints. . . ." (Tr. 26).  Even the records presented prior to the ALJ's decision, which were available for review by the state agency psychologists, show that Plaintiff had been treated since 1995 or 1996 for depression and anxiety and reported memory and concentration problems. (See Tr. 152-76, 178-85, 193, 201, 208, 210-13, 216).   Plaintiff has not pointed to evidence in these "new" records that shows limitations greater than those found by the ALJ.

### 2.   Dr. Bible's Evaluation

Plaintiff's sole contention with respect to Dr. Bible's September 2003

evaluation  (Tr. 423-26) is that it "confirms the recurrent, severe depression that Plaintiff suffers as well as the level of pain." (Pl. Br., p. 15).

The court notes that much of the evaluation provides information already in the record before the ALJ regarding Plaintiff's physical problems and history of depression.  While Dr. Bible expresses opinions about work-related limitations greater than those found by the ALJ, there is nothing in the evaluation showing that these limitations relate to the time period at issue, i.e., from the alleged September 2001 onset date until the date of the ALJ's decision.[16]  In fact, Plaintiff reported to Dr. Bible that his depression had "particularly worsened over the past six months. . . ." (Tr. 424).  Furthermore, Bible noted that  Plaintiff's "ability to deal with work related stressors appears clearly precluded **at present**." (Tr. 426) (emphasis added).   Bible also noted that when Plaintiff was not taking his medications, his condition worsened.  (Id.).  He also noted that Plaintiff had not had counseling in two years, and Bible recommended that he begin it immediately. (Tr. 424-26).  It thus appears that Plaintiff's condition may have deteriorated as a result of not having counseling and not taking medication.  At any rate, there is nothing in the evaluation showing that the limitations found by Bible were present at the time of the ALJ's decision, and in fact, the

_____

[16]The undersigned also notes that Bible's GAF of 50-60 correlates to only moderate difficulties in occupational settings, and is similar to, if not higher than, GAF's provided in the records submitted to the ALJ.

evaluation appears to show otherwise. See, e.g., McCloud v. Barnhart, No. 05-12997, 2006 U.S. App. LEXIS 2146, at *23 (11th Cir. Jan. 25, 2006) (unpublished decision) ("To the extent that the evidence addressed McCloud's history of depression and anger problems, it was cumulative. To the extent that the evidence might have shown that the problem is escalating, the evidence does not necessarily relate to the time period on or before the date of the  ALJ's decision").

Accordingly, the undersigned finds that Plaintiff has not shown that the records submitted after the ALJ's decision are new, noncumulative and material, such that there is a reasonable possibility that this evidence would change the administrative result.

## Conclusion

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.

**IT IS SO ORDERED** this 31st day of March, 2006.

*Susan S. Cole*

SUSAN S. COLE
United States Magistrate Judge